******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TATAYANA OSBORN ET AL. *v.* CITY OF WATERBURY ET AL.
## (SC 20129)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff mother and her minor child, T, an elementary school student, sought to recover damages from the defendant city of Waterbury and the defendant Waterbury Board of Education for injuries that T sustained when she was physically assaulted by two or more schoolchildren on a Waterbury public school playground during recess. The plaintiffs alleged, inter alia, that the defendants and their employees failed to adequately supervise the schoolchildren, including T, both in and out of the classroom. The case was tried to the court, which found that T's injuries were the result of the defendants' failure to provide sufficient personnel to exercise proper control over the number of students on the playground at the time. There was evidence introduced at trial that the school had a student population of about 400 and that at least 2 paraprofessionals who attended the incident involving T ran from inside the building to address the situation. The defendants appealed to the Appellate Court from the judgment in favor of the plaintiffs, claiming that the trial court improperly rejected the defendants' special defense of governmental immunity, incorrectly concluded that T's injuries were caused when an inadequate number of staff members were assigned to supervise up to 400 students when there was evidence that there were no more than 50 students on the playground at the time in question, improperly found, in the absence of expert testimony, that the number of assigned staff members was insufficient to control as many as 400 students, and improperly awarded certain damages. The Appellate Court concluded that, in the absence of expert testimony, the trial court could not properly have found that the defendants breached their duty of care to T on the basis that there was an allegedly inadequate number of adults on the playground to supervise the students. Accordingly, the Appellate Court reversed the trial court's judgment and remanded the case to that court with direction to render judgment for the defendants. The Appellate Court did not reach any of the defendants' other claims. On the granting of certification, the plaintiffs appealed to this court. *Held* that, under the facts of the present case, expert testimony was not required to establish the plaintiffs' claim of inadequate supervision, and, because the Appellate Court incorrectly concluded that the trial court could not determine that the defendants breached their duty of care to T without such testimony, the judgment of the Appellate Court was reversed and the case was remanded to that court for consideration of the remaining issues on appeal: although the education profession is a highly regulated field, the fact finder was required to determine only whether there was adequate supervision of children under the circumstances of the case, a task that was within the common knowledge of a layperson and that did not require the fact finder to apply scientific or specialized knowledge; moreover, even if there had been expert testimony regarding the desired ratio of staff to children and the facts demonstrated that the school met that ratio, the fact finder still could have determined that the supervision was inadequate because adequacy was not based simply on numbers, and nothing in the complaint limited the plaintiffs' inadequate supervision claim to a mere numerical calculation between the number of students and the number of adults.

(*Three justices dissenting in one opinion*)

Argued March 27—officially released December 3, 2019

*Procedural History*

Action to recover damages for personal injuries sustained by the named plaintiff as a result of the defendants' alleged negligence, and for other relief, brought

to the Superior Court in the judicial district of Waterbury, where the action was withdrawn as to the defendant Stephanie Pascale et al.; thereafter, the case was tried to the court, *Hon. Barbara J. Sheedy*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiffs, from which the named defendant et al. appealed to the Appellate Court, *Lavine*, *Prescott* and *Harper*, *Js.*, which reversed the trial court's judgment and remanded the case with direction to render judgment for the named defendant et al., and the plaintiffs, on the granting of certification, appealed to this court. *Reversed*; *further proceedings*.

*Richard M. Franchi*, for the appellants (plaintiffs).

*Daniel J. Foster*, acting assistant corporation counsel, for the appellees (named defendant et al.).

*Opinion*

MULLINS, J. This appeal arises from an action filed by the plaintiffs, Tatayana Osborn (child), a minor child, by and through her mother, Tacarra Smith, alleging negligence on the part of the defendant city of Waterbury (city) and the defendant Waterbury Board of Education (board) for injuries sustained by the child during an altercation with other students during recess at a Waterbury public school.[1] In this certified appeal,[2] we must determine whether the Appellate Court correctly concluded that expert testimony was necessary to establish the standard of care in this negligence action. We conclude that, under the facts of the present case, expert testimony was not necessary. Accordingly, we reverse the Appellate Court's judgment and remand the case to that court for consideration of the remaining issues on appeal.

The opinion of the Appellate Court, as supplemented by the record, sets forth the following facts and procedural history. "On April 25, 2012, the child was an elementary school student when she was assaulted by other students while they were on the playground during the lunchtime recess. As a result of the assault, the child sustained a cut to her face that required sutures . . . and [that] resulted in scarring. The plaintiffs commenced the present action against the city [and] the board, [among others]." *Osborn* v. *Waterbury*, 181 Conn. App. 239, 241–42, 185 A.3d 675 (2018). In their complaint, the plaintiffs alleged, inter alia, that the plaintiffs' injuries and damages "were caused by the negligence and carelessness of the defendant[s] in that [they] . . . failed to adequately supervise the children both in and out of the classroom, including the [child]."

"The parties tried the case to the court. Following the presentation of evidence, the court issued a memorandum of decision in which it found that the child was a fifth grade student at Sprague Elementary School in Waterbury when she was assaulted by two or more students on the playground. The playground was surrounded by brick walls and fencing, and, following lunch, students occupied the area for play and exercise. More specifically, the child was surrounded by a circle of students who physically assaulted her and pushed her into a stone wall, causing injuries to her nose and cheek with resulting facial scarring. The child experienced posttraumatic headaches for a sustained period of time, but the most serious effect of this schoolyard assault was its lingering effect on the child's emerging personality and self-image.

"The court also found that Danielle Avalos, a school paraprofessional, was assigned to monitor the students on the playground during recess. She was not provided with written documents that listed her duties during the lunchtime recess. Her two day professional develop-

ment training occurred prior to the first day of school and focused on the forms of student bullying and the need to distinguish between bullying and students merely 'picking on' other students or otherwise being unkind to them." *Osborn* v. *Waterbury,* supra, 181 Conn. App. 242–43.

The trial court found that "[t]here was also no evidence to suggest that only portions of the student body were released for [lunch] at a given time; it is more likely the student body ate together in the [lunch] room and then went outside for recreation—in large numbers." The trial court further found that, "[a]t the time of the incident, classroom teachers were on [lunch] recess (and there was no evidence to establish that staff lunch times were staggered). The court concludes that 1 student intern and 3 or 4 staff members were not sufficient to exercise control over as many as 400 students [on the playground]."

"With respect to the incident during which the child was injured, the court found that Avalos saw a student repeatedly punch the child in the face and push her into a wall. A precis prepared by the nursing division of the Waterbury Health Department referenced, 'a large, deep cut on the [child's] left cheek' and 'a cut of lesser depth on the bridge of her nose.' " *Osborn* v. *Waterbury,* supra, 181 Conn. App. 243–44. The court rendered judgment in favor of the plaintiffs.

After trial, the defendants sought an articulation from the trial court pursuant to Practice Book §§ 61-10 and 66-5. Specifically, the defendants requested that the trial court articulate "(1) whether the court found either or both of the individual defendants who remain in the case to be liable for the plaintiffs' injuries and losses, and, if so, on what basis, and (2) whether the court found that the plaintiffs' injuries and losses were caused by the fact, as found by the court, that the number of adults present on the playground where the injuries took place was insufficient to exercise proper control over the number of students present."

The trial court responded to the defendants' request for articulation as follows:

(1) "This court did <u>not</u> find any remaining individual (specifically . . . Avalos or Donna Perreault) was liable for the plaintiffs' injuries or losses . . . .

(2) "This court found [that] the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present.

(3) "The court (in [an] August 12, 2016 ruling) found [that] the plaintiffs' injuries were caused by insufficient staffing of personnel to exercise proper control over the number of students on the playground at the time (perhaps as many as 400 students) . . . .

(4) "The court concluded [that] the injuries to the

plaintiffs were proximately caused by an insufficient number of staff personnel—to monitor the actions of students on the playground on the date of injury." (Citation omitted; emphasis in original.)

The defendants appealed from the judgment of the trial court to the Appellate Court, claiming that "the trial court improperly (1) rejected their special defense of governmental immunity for discretionary acts, (2) concluded that the plaintiffs' injuries were caused when an inadequate number of adults were assigned to supervise up to 400 students when there was evidence that there were no more than 50 students on the playground, (3) found in the absence of expert testimony that 1 student intern and 3 or 4 staff members were insufficient to control as many as 400 students on the playground, and (4) awarded damages intended to encourage continued therapy and occupational training for the child in the absence of evidence that she would need such services in the future." *Osborn* v. *Waterbury*, supra, 181 Conn. App. 241.

The Appellate Court concluded, "as a matter of law, that without expert testimony, the court could not properly have found that the defendants breached their duty of care to the child [on the basis that] there was an inadequate number of adults on the playground to supervise the students at the time the child was injured." Id. As a result, the Appellate Court reversed the judgment of the trial court and remanded the case with direction to render judgment for the defendants. Id., 247. The Appellate Court did not reach any of the defendants' other claims on appeal. This certified appeal followed.

On appeal to this court, the plaintiffs assert that the Appellate Court incorrectly concluded that, without expert testimony, the trial court could not determine that the defendants breached their duty of care to the child. The defendants respond that the Appellate Court correctly determined that expert testimony was necessary to establish the standard of care. We agree with the plaintiffs that the Appellate Court incorrectly concluded that the trial court could not determine that the defendants breached their duty of care to the child without expert testimony.

Before we begin our analysis, it is important to clarify two points. First, we read the plaintiff's complaint and the trial court's ruling thereon to involve a claim of inadequate supervision. Unlike the defendants and the Appellate Court, we understand the trial court's response to the request for articulation, namely, that "the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present," as a conclusion that there was inadequate supervision, not that there was solely an inadequate number of staff on the playground.[3] Such a conclusion is consistent with the well established principle

that "we read the record in the light most favorable to sustaining the trial court's judgment." *Weiss* v. *Smulders*, 313 Conn. 227, 232 n.2, 96 A.3d 1175 (2014). As a result, we consider whether expert testimony was required for the plaintiffs' negligence claim of inadequate supervision.[4]

Second, we understand that the linchpin of the Appellate Court's decision is that, because schools are highly regulated areas, expert testimony was required. We disagree that the fact that a particular area is highly regulated necessarily means that expert testimony is required for claims of negligence arising in that area. Rather, we conclude that, irrespective of the heightened regulations of a particular field, whether expert testimony is required to support a claim of negligence turns on whether the alleged claim of error is within the common knowledge of a layperson.[5]

"As an initial matter, we note that the [trial] court's determination of whether expert testimony was needed to support the plaintiff's claim of negligence against the defendant was a legal determination, and, thus, our review is plenary." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 373, 119 A.3d 462 (2015).

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty. . . . We sometimes refer to the scope of that duty as the requisite standard of care. . . .

"[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. . . . Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation at hand would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken." (Citations omitted; internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 123–24, 809 A.2d 505 (2002).

"[E]xpert testimony . . . serves to assist lay people,

such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard. . . . Expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 125; see *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 374; see also *Doe* v. *Yale University*, 252 Conn. 641, 686–87, 748 A.2d 834 (2000) ("[w]hether expert testimony was required to support the plaintiff's claim compels us to consider whether the determination of the standard of care requires knowledge that is beyond the experience of [the] fact finder" [internal quotation marks omitted]). Indeed, this court has often said that "[t]he trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." *Way* v. *Pavent*, 179 Conn. 377, 380, 426 A.2d 780 (1979); see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 375 ("[j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct" [internal quotation marks omitted]).

Typical cases in which expert testimony is required are those that "are akin to allegations of professional negligence or malpractice . . . ." *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996). Nevertheless, expert testimony is not required for all claims arising from a professional relationship despite the fact that those areas are highly specialized and regulated.

There are two types of cases arising from a professional relationship in which expert testimony is not required. In one type of case, expert testimony is not required because the negligence is so gross as to be clear to a layperson. See *Davis* v. *Margolis*, 215 Conn. 408, 416 n.6, 576 A.2d 489 (1990) (expert testimony is not required in legal malpractice cases "where there is present such an obvious and gross want of care and skill that the neglect is clear even to a layperson" [internal quotation marks omitted]). In the other type of case, expert testimony is not required because the alleged claim of error involves a task that is within the common knowledge of a layperson. See *Doe* v. *Cochran*, 332 Conn. 325, 337, 210 A.3d 469 (2019) (explaining that expert testimony was not necessary because "alleged error [was] not one involving professional medical judgment or skill"). The present case falls within the second category.

Indeed, *Badrigian* v. *Elmcrest Psychiatric Institute, Inc.*, 6 Conn. App. 383, 505 A.2d 741 (1986), highlights this second category of cases. The Appellate Court con-

cluded that expert evidence was not necessary in a negligence claim against a psychiatric hospital, when that claim alleged that the hospital failed to supervise its patients, particularly in crossing a state highway. Id., 385. The Appellate Court explained that "[t]he defendant is attempting to transform this case from one of simple negligence into that of medical malpractice requiring expert medical testimony to prove a medical standard of care and a breach thereof." Id., 386. The Appellate Court further explained that "one need not be guided by medical experts in determining whether a mentally ill person should be allowed to cross on foot a heavily traveled four lane state highway without supervision. There was no esoteric or uniquely medical issue to be determined under the allegations of [the] case, and the court correctly categorized the negligence charged against the hospital as involving 'no materia medica, nor any complex issue requiring specialized knowledge.' " Id., 387.

Similarly, in *Cammarota* v. *Guerrera*, 148 Conn. App. 743, 751–52, 87 A.3d 1134, cert. denied, 311 Conn. 944, 90 A.3d 975 (2014), the Appellate Court concluded that expert testimony was not necessary in a case involving a claim of legal malpractice. The claim of legal malpractice centered on the defendant lawyer's act of giving a check payable to his client to another individual, notwithstanding the fact that the defendant had been warned that that individual was untrustworthy. Id., 751 and n.6. The Appellate Court explained that "[t]he question of whether expert testimony is required is not resolved by characterizing the case as sounding in legal malpractice or ordinary negligence, but rather by determining whether the issue, unaided by expert testimony, is within the realm of a jury's ordinary knowledge. Thus, professional negligence claims do not necessarily require expert testimony, and claims of ordinary negligence may require expert testimony. The appropriate question is whether the issue can be reliably decided by a jury without the assistance of expert testimony." Id., 751.

In the present case, the Appellate Court concluded that, "as a matter of law . . . the standard of care regarding the number of supervisors needed to ensure the safety of elementary school students on a playground is not a matter of common knowledge; far from it. The policies and procedures of our public school system are highly regulated by governing bodies and accreditation organizations. School teachers and administrators are required to be accredited in accordance with educational standards."[6] *Osborn* v. *Waterbury*, supra, 181 Conn. App. 246. Although we agree with the Appellate Court that the education profession is a highly regulated field, our case law demonstrates the fact that a profession that is highly regulated does not mean that expert testimony is always required in cases alleging negligence against a professional in that

field. Instead, whether expert testimony is required in a particular case depends on whether the alleged error is within the common knowledge of a layperson.

In this case, the plaintiffs claimed, inter alia, that their injuries and damages were caused by "the negligence and carelessness" of the defendants in that they "failed to adequately supervise the children both in and out of the classroom, including the [child] . . . ." Therefore, we must determine whether the alleged error here, namely, the supervision of children, involves professional judgment or skill, or whether it is a task comparable to those that laypeople routinely perform.

We find this court's recent decision in *Doe* v. *Cochran*, supra, 332 Conn. 325, instructive. In *Doe*, we addressed a claim against a physician for incorrectly reporting the results of a test for sexually transmitted diseases to a patient. Id., 329. In concluding that the plaintiff had alleged a claim of ordinary negligence, we explained that "the alleged error is not one involving professional medical judgment or skill. If the defendant misread [the patient's] lab result, then he failed to perform what was, in essence, a simple, ministerial task. The index to the report states that a result greater than 1.1 indicates a positive test, and the report states that [the patient's] result was 4.43. No advanced medical training was necessary to determine that [the patient] had tested positive for herpes; elementary reading and arithmetic skills should have been sufficient. Indeed, laypeople routinely perform comparable tasks, such as reading and interpreting meat thermometers, oil dipsticks, pool and spa test strips, and insulin tests." Id., 336–37.

This court further explained that, "[o]f course, the same conclusion holds to an even greater extent if the genesis of the error was that the defendant simply told his staff member the wrong test result or the staff member relayed the wrong result to [the patient]. That sort of careless miscommunication could occur in any setting and has nothing to do with the exercise of professional medical judgment or skill." Id., 337. "[R]egardless of whether the alleged error arose from a misreading or a miscommunication, proving that it constituted negligence would not require expert medical testimony or the establishment of a professional standard of care. A jury will not need expert testimony to determine whether the defendant's staff was negligent in leading [the patient] to believe that he was free of [sexually transmitted diseases] when the defendant knew, or should have known, that [the patient] had tested positive for herpes, a contagious [sexually transmitted disease], and intended to engage in sexual activity. Such a determination is well within the ken of a layperson." Id.

Like the alleged claim of error in *Doe* v. *Cochran*, supra, 332 Conn. 336–37, the task of supervising children is one that laypeople routinely perform. It was not an issue that required scientific or specialized knowl-

edge. To the contrary, a determination of adequate supervision of children is common knowledge, based on everyday life. The fact that this incident occurred on a playground during school hours, rather than on the same playground after school hours, does not change the fact finder's ability to determine what constitutes adequate supervision.

Moreover, we disagree with the Appellate Court that the plaintiffs' claim required the fact finder to determine "the standard of care regarding the number of supervisors needed to ensure the safety of elementary school students on a playground . . . ." *Osborn* v. *Waterbury*, supra, 181 Conn. App. 246. The fact finder was not asked to determine solely the required ratio of children to staff members; instead, the question confronting the fact finder, based on the allegations in the complaint and the evidence presented at trial, was whether there was adequate supervision of the children involved in this particular incident.[7] Indeed, even if there had been expert testimony regarding the desired ratio of staff to children and the facts demonstrated that the school met that ratio, the fact finder still may have determined that the supervision was not adequate because adequacy is not based just on numbers, and nothing in the complaint limited the plaintiffs' claim to a mere numerical calculation between the number of students and the number of adults. This was an inadequate supervision case.[8]

The trial court found that "[a] large group of students surrounded [the child]. They threw stones at her—most of which were aimed at her face. . . . It was . . . Avalos' testimony that she saw a student repeatedly punch the [child] in the face and push her into a wall." The trial court further found that, "[a]t the time of the incident, classroom teachers were on [lunch] recess (and there was no evidence to establish that staff lunch times were staggered)." Furthermore, the evidence in the present case demonstrated that the paraprofessionals who broke up the incident and attended to the child after the child was hurt had to run from *inside* the building to address the situation.

Specifically, Avalos testified that she was assigned to supervise students on the playground during recess but that she was inside the school building when she saw the incident and had to run outside to stop the incident. Although Avalos testified at trial that she saw other teachers on the playground when she arrived at the scene of the incident, the defendants did not present any testimony from those staff members or any other staff member who was actually on the playground supervising the children.[9] Furthermore, there was no evidence that any staff member who was allegedly on the playground responded to the incident.[10]

Therefore, the issue in the present case was whether the supervision of the children was adequate when a

large group of children was able to gather around the child, throwing stones at her, and with one student repeatedly punching the child in the face and pushing her into a wall. We conclude that the fact finder in the present case did not need to apply scientific or specialized knowledge to determine whether the defendants adequately supervised the children in the present case. Accordingly, we conclude that the Appellate Court improperly reversed the judgment of the trial court on the ground that, without expert testimony, judgment could not be rendered for the plaintiffs.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendants' remaining claims on appeal.

In this opinion PALMER, D'AURIA and ECKER, Js. concurred.

[1] The plaintiffs also brought this action against Stephanie Pascale, a fifth grade teacher; Charles Stango, the president of the board; Danielle Avalos, a paraprofessional at the school; and Donna Perreault, the school principal. They withdrew the action against Pascale and Stango in the trial court. In its articulation, the court clarified that it did not find that Avalos and Perreault were liable for the plaintiffs' injuries. Avalos and Perreault, therefore, withdrew from the present appeal. In this opinion, we refer to the city and the board as the defendants.

[2] We granted the plaintiffs' petition for certification to appeal, limited to the following issues: (1) "In reversing the judgment of the trial court, did the Appellate Court properly determine that expert testimony was necessary to establish the standard of care?"

(2) "Did the plaintiffs receive adequate notice of the need for expert testimony to determine the scope of the duty of care such that a directed judgment was appropriate in this case?" *Osborn* v. *Waterbury*, 329 Conn. 901, 184 A.3d 1214 (2018).

Because we conclude that expert testimony was not necessary in the present case, we need not address the second certified question.

[3] In response to the defendants' request for an articulation, the trial court also stated that "[t]he court concluded [that] the injuries to the plaintiffs were proximately caused by an insufficient number of staff personnel—to monitor the actions of students on the playground on the date of injury." It was this statement on which the Appellate Court based its analysis. Nevertheless, a review of the allegations of the plaintiffs' complaint, the evidence presented at trial, the transcripts of the trial, and a fair reading of the memorandum of decision and articulation in the light most favorable to sustaining the trial court's judgment demonstrate that the issue for the trial court to determine was whether the supervision was adequate, not merely whether the number of staff was sufficient.

[4] The dissent is premised on an interpretation of the trial court record with which we fundamentally disagree. The dissent repeatedly asserts that "the *sole basis* of the trial court's conclusion that the defendants' supervision of the children was negligent was the supervisor to student ratio . . . ." (Emphasis added.) This conclusion ignores the articulation of the trial court that "the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present." This articulation makes clear that the supervisor to student ratio was not the *sole basis* of the trial court's conclusion that the defendants were negligent but that, regardless of the supervisor to student ratio, the defendants did not exercise proper control over the students.

[5] The dissent seems to agree that the fact that schools are a highly regulated area is not dispositive of whether expert testimony was required for this claim of negligence. Instead, the dissent's conclusion that expert testimony was required in this case is premised on the existence of a board policy regarding a supervisor to student ratio for supervision, about which the principal testified. Specifically, the dissent asserts that "[t]he issue presented in this appeal . . . is whether expert testimony was required to enable the trier of fact to determine that the defendants' supervision of the playground was negligent, *notwithstanding the fact that the supervisor to student ratio*

*complied with or exceeded the goals set forth in the board's policy.*" We disagree with the dissent that, on this record, the trial court had to accept that any supervisor to student ratio was established merely because the principal testified that one existed.

The dissent acknowledges that "[t]he written policy . . . was not admitted into evidence, and the court made no finding in that regard." Thus, the principal's testimony is the only evidence of the existence of the policy and what the policy contained; that testimony, of course, was subject to the court's finding it credible. The fact that the court made no finding regarding the policy or what it contained demonstrates to us that the court did not credit the principal's testimony regarding the policy or the ratio. Because the court did not credit the principal's testimony, we conclude that, as matter of fact, no particular supervisor to student ratio was established at trial.

The dissent also "disagree[s] . . . with the majority's suggestion that there was not enough evidence in the record to allow the trial court, as fact finder, to draw the reasonable inference that the policy testified to by the principal was one that was in existence and applicable at the time of the incident." This misconstrues our conclusion. First, it is axiomatic that the trial court was not required to credit the principal's testimony regarding the policy—neither when the policy was established nor what the policy contained. See, e.g., *In re Gabriella A.*, 319 Conn. 775, 798, 127 A.3d 948, 960 (2015) (it is undisputed that "the trial court, as the fact finder, was free to accept or reject portions of [each witness'] testimony"). Indeed, the dissent concedes that the trial court made no findings in this regard.

Second, we agree that there was evidence, *if credited*, for the court to make a finding that the policy testified to by the principal was applicable. However, there is simply nothing in the record to demonstrate that the trial court did credit the principal's testimony. Instead, having had that testimony before it, the trial court did not make a finding regarding the policy or any ratio it may have contained. Therefore, we will not elevate that testimony to a factual finding regarding the proper supervisor to student ratio when the trial court itself did not do so. Rather, on appeal, "we read the record in the light most favorable to sustaining the trial court's judgment." *Weiss* v. *Smulders*, 313 Conn. 227, 232 n.2, 96 A.3d 1175 (2014). Accordingly, the fact that there was testimony in the record to support a finding that is contrary to the judgment of the trial court is irrelevant.

[6] It is important to note that, although the principal testified at trial that the board had a "policy" of 1 staff member to 125 students, there was no evidence regarding whether that was a written or verbal policy, whether the policy even existed at the time of the incident four years prior to trial or whether it was adopted in response to the incident. Tellingly, no written policy was ever introduced into evidence.

Furthermore, and perhaps more important, even if the board had adopted a written policy prior to the incident that the school should maintain a ratio of 1 staff member to 125 students, the fact that the school and the board complied with its own policy is not determinative of whether the school was negligent in its supervision of the students in the present case. "This court has stated that, [a]lthough a violation of an employer's work rules can be viewed as evidence of negligence . . . [self-imposed] rules, regulations and policies do not themselves establish the standard of care. . . .The rule is well established and is consistent with the general principle that the standard of care in a negligence action is an objective one, determined by external standards, and not a rule derived from individual practices." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Saint Francis Hospital & Medical Center*, 309 Conn. 146, 279, 72 A.3d 929 (2013) (*Zarella, J.*, dissenting). There was no evidence presented in the present case regarding any regulation or accreditation standard regarding the supervision of students.

[7] In their complaint, the plaintiffs alleged, inter alia, that their "injuries and damages were caused by the negligence and carelessness of the defendant[s] in that [they] . . . failed to adequately supervise the children both in and out of the classroom including the [child] . . . ."

At trial, the plaintiffs' counsel explained as follows: "A couple of things we know: even though [Avalos is] on recess duty . . . [s]he wasn't there during recess, at least part of it, the part where my client got injured. Also, there was another person who was supposed to be on duty; her name was Marlene. She was not on the playground as her recess duty schedule required, while my client was being assaulted. What we know is they looked out a window inside the building, at least one of them, and at that point in time

. . . Avalos sees something happening. She then runs through the cafeteria carrying two walkie-talkies. She gives one to Marlene, goes outside, and starts running toward some people. Supposedly, Marlene is in back of her; this is what she says."

[8] The following colloquy between the trial court and the defendants' counsel demonstrates that the issue before the trial court was whether the supervision on the playground was adequate, not merely whether the number of supervisors on the playground was adequate:

"The Court: Well, let me ask you another question, Counsel . . . . Do you claim that, at the time the injury was inflicted upon the [child], there was anybody providing supervision and guidance on the playground?

"[The Defendants' Counsel]: Yes.

"The Court: Who?

"[The Defendants' Counsel]: The paraprofessional . . . Avalos, was at the door, as well as—

"The Court: What door? What door?

"[The Defendants' Counsel]: The door from the cafeteria leading to—

"The Court: That's not where the injury occurred.

"[The Defendants' Counsel]: Well, the injury occurred on the playground.

"The Court: Well, yeah, I mean that's like saying, you know, I live in—

"[The Defendants' Counsel]: Well then, no, Your Honor, then no one was at the exact scene where this incident occurred.

"The Court: Okay.

"[The Defendants' Counsel]: But for—

"The Court: And there was nobody on the playground at the time.

"[The Defendants' Counsel]: Well, no, I disagree with that, as well. There is—

"The Court: Well, then tell me who they are so that I can correct that misimpression.

"[The Defendants' Counsel]: The gym teacher and—is Ms. Thompson, I think; and then Ms. Yago (phonetic), who—the health teacher, I believe. There were two—One was playing kickball and one was walking around. That was—

"The Court: But nobody—nobody was there for the purpose of supervising the students at—on the playground.

"[The Defendants' Counsel]: The purpose of those individuals being on the playground is to supervise, as well as to interact with students.

"The Court: Oh, so you can supervise and play kickball at the same time, Counsel?

"[The Defendants' Counsel]: I don't know if they were supposed to be playing kickball, per se, but they're on the playground in order to interact [with] and supervise the students."

[9] The trial court commented as follows: "[T]hat's why I come back again to who was out there supervising the children. It doesn't appear clear to me at all from the evidence that was submitted, and you could have put on somebody who would have so testified clearly."

[10] In its memorandum of decision, the trial court explained: "The court concludes that 1 student intern and 3 or 4 staff members were not sufficient to exercise control over as many as 400 students [on the playground]." It is important to note that the trial court did not find that 4 teachers and 1 student intern were on the playground. Indeed, the testimony at trial was not clear on this point. Although Avalos testified at trial that other staff members were on the playground when she arrived outside to break up the incident, contradictory testimony from her deposition was also admitted into evidence. At her deposition, Avalos testified that she did not recall any other staff members being on the playground when she arrived outside to break up the incident. This understanding is bolstered by the fact that, during closing arguments, the trial court remarked as follows: "The court's concern is whether or not there was in fact anyone [on the playground]." The court certainly appeared skeptical of the principal's testimony that four staff members were on the playground. Indeed, as we have mentioned, the court pointed out that it did not hear from any of the people the principal claims were on the playground and, if they were on the playground, that they were adequately supervising the children. In light of these facts, we understand the trial court's conclusion to be that, even if the facts were as favorable to the defendants as the defendants allege, the court's conclusion, based on all of the evidence, was that the supervision was still inadequate.

———————————————